## UNITED STATED DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Association for Government Accountability, Senator Mark Koran, Senator Calvin Bahr, James Roschen, Debra Roschen, Megan Nelson, Andrew Nelson, Dawn Appel, Daniel Appel, Cindy Kohn, David Kohn, Tammi Johnson, Larry Johnson, Meghan Hewitt, A.H., by her next friend and parent Meghan Hewitt, Sarah Johnson, A.J., by his next friend and parent Sarah Johnson, | Case No. 23-cv-03159 |

        Plaintiffs,

v.

Steve Simon, in his official capacity as Minnesota Secretary of State, or his successor, David Maeda, in his official capacity as Director of Elections for State of Minnesota, or his successor,

        Defendants.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Jury Trial Demand

The above-named plaintiffs, for their complaint against above-named defendants, or their successors, state and allege as follows.

1.  The plaintiffs seek prospective injunctive and declaratory relief based on the claim that Defendant Secretary of State Steve Simon and Defendant David Maeda under Minnesota Statutes § 201.13(d) have an ongoing contract with the private Delaware non-stock corporation Electronic Registration Information Center, Inc. (ERIC), which mandates disclosures to ERIC by defendants of plaintiffs' private driver data for use in state-sponsored voter registration drives, violating the plaintiffs' rights under the 1994 Driver's Privacy

Protection Act ("DPPA"), 18 U.S.C. § 2721 et seq., because such state-sponsored voter registration drives are expressly preempted under 52 U.S. Code § 21084 due to such state-sponsored voter registration drives being inconsistent with federal law, including 52 U.S. Code § 21083(5)(B)(i).

## Jurisdictional Statement

2.     The Plaintiffs have a private cause of action against defendants and this Court has jurisdiction under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq., which provides "A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724(a).

3.     The 18 U.S.C. § 2725(2) exclusion of "a state or agency therof" from the definition of liable "person" in the DPPA only excludes claims for damages, not claims for equitable relief such as for prospective declaratory and injunctive relief, against a "person" who is a state official sued in their official capacity, or their successor, under the *Ex parte Young* doctrine.  18 U.S.C. § 2725(2) ("person" means "an individual, organization or entity, but does not include a State or agency thereof").

4.     Venue is proper in this Court under 28 U.S.C. § 1391.

## Parties
## Plaintiffs

5.      Plaintiff Association for Government Accountability (AGA) is an association of Minnesota residents who by community organization action seek to improve the

government. Individual plaintiffs James Roschen, Debra Roschen, Megan Nelson, Andrew
Nelson, Dawn Appel, Daniel Appel, Cindy Kohn, David Kohn, Tammi Johnson, Larry
Johnson, Meghan Hewitt, A.H., Sarah Johnson, A.J., are all involved with the Association
for Government Accountability.

6.      Plaintiff Mark Koran has been a Minnesota State Senator since 2016 and is the
Ranking Minority Member of the Senate Elections Committee. Mark Koran is also over 18
years old and is a registered voter and licensed driver in Minnesota.

7.      Plaintiff Calvin "Cal" Bahr was a member of the House of Representatives
from 2016-2022 and is now serving his first term as a Minnesota State Senator where he is a
member of the Senate Elections Committee. Calvin Bahr is also over 18 years old and is a
registered voter and licensed driver in Minnesota.

8.      Plaintiff James Roschen is over 18 years old and is a registered voter and
licensed driver in Minnesota. He is the husband of plaintiff Debra Roschen.

9.      Plaintiff Debra Roschen is over 18 years old and is a registered voter and
licensed driver in Minnesota. She is the wife of plaintiff James Roschen.

10.     Plaintiff Megan Nelson is over 18 years old and is a registered voter and
licensed driver in Minnesota. She is the wife of plaintiff Andrew Nelson.

11.     Plaintiff Andrew Nelson is over 18 years old and is a registered voter and
licensed driver in Minnesota. He is the husband of plaintiff Megan Nelson.

12.     Plaintiff Dawn Appel is over 18 years old and is a registered voter and licensed
driver in Minnesota. She is the wife of plaintiff Dan Appel.

13.     Plaintiff Daniel Appel is over 18 years old and is a registered voter and

3

licensed driver in Minnesota. He is the husband of plaintiff Dawn Appel.

14.     Plaintiff Cindy Kohn is over 18 years old and is a registered voter and licensed driver in Minnesota. She is the wife of plaintiff Dave Kohn.

15.     Plaintiff David Kohn is over 18 years old and is a registered voter and licensed driver in Minnesota. He is the husband of plaintiff Cindy Kohn.

16.     Plaintiff Tammi Johnson is over 18 years old and is a registered voter and licensed driver in Minnesota. She is the wife of plaintiff Larry Johnson.

17.     Plaintiff Larry Johnson is over 18 years old and is a registered voter and licensed driver in Minnesota. He is the husband of plaintiff Tammi Johnson.

18.     Plaintiff Meghan Hewitt is over 18 years old and is a registered voter and licensed driver in Minnesota. She is the mother and next friend of minor plaintiff A.H.

19.     Plaintiff A.H. is 15 years old and is the minor child of plaintiff Meghan Hewitt. As a minor, A.H. is too young to be eligible to register to vote. A.H. is represented by her next friend and parent Meghan Hewitt.

20.     Plaintiff Sarah Johnson is over 18 years old and is a registered voter and licensed driver in Minnesota. She is the mother and next friend of minor plaintiff A.J.

21.     Plaintiff A.J. is 15 years old and is the minor child of plaintiff Sarah Johnson. He has his driver learner's permit and plans to obtain his driver's license when he reaches the age of 16. As a minor, A.J. is too young to be eligible to register to vote. A.J. is represented by next friend and parent Sarah Johnson.

22.     All the plaintiffs expressly preserve the right to register to vote and to decline to register to vote.

**Defendants**

23.     Defendant Secretary of State Steve Simon, or his successor, is a state election official with election duties under federal and state law.  As part of his duties under federal law, particularly the Help America Vote Act (HAVA), he acts to implement and maintain the statewide voter registration system (SVRS) database.  The defendant has contracted with the Electronic Registration Information Center, Inc. (ERIC), a Delaware non-profit corporation with a business address at 1155 F St NW #1050, Washington, DC 20004.  Exhibit 14.  The defendant is sued for prospective injunctive and declaratory relief only, not monetary damages.

24.     Defendant Director of Elections for State of Minnesota David Maeda, or his successor, is a state election official with election duties under federal and state law.  As part of his duties under federal law, particularly the Help America Vote Act (HAVA), he acts to implement and maintain the statewide voter registration system (SVRS) data base.  The defendant is also the state's designated representative in its membership with ERIC. The defendant is sued for prospective injunctive and declaratory relief only, not monetary damages.

25.     A non-party worth mentioning is Minnesota's Department of Public Safety (DPS) which has a division called the Driver and Vehicle Services Division.

26.     Another non-party worth mentioning is the U.S. Election Assistance Commission (EAC) which is a federal agency created under HAVA to implement HAVA in the states.

**Factual Background**

27.     To begin, the plaintiffs' DPPA private driver data concerns center on two

contracts involving the defendants which share the plaintiffs' private driver data with two

different entities for two very different purposes.

28.     The DPPA, 18 U.S.C. § 2721 et seq.,  was enacted in 1994 to protect the

sensitive personal data that is collected by state motor vehicle agencies such as the

Minnesota Department of Public Safety (DPS).

29.     The plaintiffs have DPPA-protected personal data stored with the DPS,

including driver license numbers and social security numbers.

30.     Two contracts, involving the defendants, authorize the disclosure of plaintiffs'

private driver data involving two different entities for two very different purposes.

31.     First, a true and correct copy of the Defendants' contract with the

Department of Vehicles Service (DPS) dated June 26, 2020, is attached as Exhibit 3.

32.     Paragraph 2.1 of the DPS contract authorizes DPS to share registered voters'

private driver data, including plaintiffs' driver data, with the Secretary of State (SOS) for the

purposes of § 21083(5)(B)(i):

> 2.1     Driver's license and/or State identification card matching agreement.
> Pursuant to Section 303 of the Help America Vote Act, Public Law 107-252, DPS will
> provide OSS a daily encrypted file with matching public data, see Exhibit A Section 1
> ["DPS Data"], from the database containing Minnesota driver's license and Minnesota
> identification card information. The daily file will contain public data on new and
> updated voter registration applications as provided by the Statewide Voter Registration
> System ["SVRS"] operated by OSS. The public data provided will be sufficient to
> process new and updated voter registration applications as required by Minnesota
> Statutes, Chapter 201 and Minnesota Rules, Chapter 8200. The specific method to
> process the data file is set forth in Exhibit B, which is attached and incorporated into
> this Agreement.

33. The purpose of the DPS contract is to use private driver data to match voter registration application information as shown in the agreement's diagram:



Exhibit 3, State of Minnesota Interagency Agreement, Exhibit A.

34. 52 U.S. Code § 21083(5)(B)(i) requires a state's DPS to disclose with state election officials, pursuant to an agreement between the two state agencies, only so the public officials can match voter registration application information:

> (B) Requirements for State officials
> (i) Sharing information in databases
> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

35. The DPS contract entered under § 21083(5)(B)(i) has the following attributes to satisfy the legal requirements of § 21083(5)(B)(i):  an agreement between the two state agencies; and, disclosure is only to the extent required to enable public officials to match

7

voter registration application information.

36.     However, importantly, Paragraph 2.3 of the DPS contract additionally requires DPS to share the state's entire private driver data file, including plaintiffs' driver data, with the Secretary of State (SOS) for disclosure to "an organization governed exclusively by a groups of states to improve the accuracy of voter registration records in the SVRS":

> 2.3     Driver's license and Minnesota identification card database export.
> Pursuant to Minn. Stat. § 171.12 subd. 7a and Minn. Stat. § 201.13, subd. 3, DPS will provide OSS a monthly encrypted database file containing Minnesota's complete driver license and state identification card data, see Exhibit A Section 3 ["DPS Data"]. The provided data will be used for matching with information obtained by an organization governed exclusively by a group of states to improve the accuracy of the voter registration records in the SVRS. The data may not be retained by OSS for more than 60 days. The data that may be shared are: name, date of birth, address, driver's license or state identification card number, the last four digits of an individual's Social Security number, and the date that an individual's record was last updated.

37.     The "organization governed exclusively by a groups of states to improve the accuracy of voter registration records in the SVRS" is ERIC.

38.     But, ERIC is a Delaware non-profit corporation, Delaware File No. 5115291, with a business address at 1155 F St NW #1050, Washington, DC 20004, regardless of who serves on its board.  Exhibit 14.

39.     The fact that a non-profit, non-stock corporation has a board consisting of government officials does not legally transform the corporate entity into a government entity.

40.     ERIC is not an agent of the State of Minnesota or of the defendants.  Exhibit 1, ERIC Membership Agreement ¶ 14.

41.     And, no federal law has incorporated ERIC.

42.     ERIC is a Delaware non-profit corporation not owned by the federal government, not sponsored by the federal government, and nor has it been acquired by the federal government.

43.     Second, a true and correct copy of the ERIC Bylaws and Membership Agreement with the signed version dated July 31, 2014 (ERIC contract), is attached as Exhibit 1.

44.     Minnesota Statutes § 201.13 (d) is accurately quoted as authorizing the defendants to disclose to ERIC private driver data received from the DPS:

> If, in order to maintain voter registration records, the secretary of state enters an agreement to share information or data with an organization governed exclusively by a group of states, the secretary must first determine that the data security protocols are sufficient to safeguard the information or data shared. If required by such an agreement, the secretary of state may share the following data from the statewide voter registration system and data released to the secretary of state under section 171.12, subdivision 7a:
> (1) name;
> (2) date of birth;
> (3) address;
> (4) driver's license or state identification card number;
> (5) the last four digits of an individual's Social Security number; and
> (6) the date that an individual's record was last updated.

45.     And, Minnesota Statutes § 171.12, subd. 7a, is accurately quoted as authorizing the DPS to transfer the private driver data to the defendants, "The commissioner [of public safety] shall disclose personal information to the secretary of state for the purpose of increasing voter registration and improving the accuracy of voter registration records in the statewide voter registration system."

46.     Under Minnesota Statutes § 201.13(d) and the ERIC Contract, the defendants, on a periodic basis, share Plaintiffs' private driver data, including driver's license number and social security number (last 4 digits), with ERIC.

47.     Specifically, paragraph 2 of the ERIC contract (Exhibit 1, ERIC Membership Agreement) requires the defendants to disclose the state's private driver data, including plaintiffs' driver data, to ERIC:

2.  <u>Voter Files and Motor Vehicle Records</u>. The Member shall transmit to ERIC the following data related to its voter files and motor vehicle records (collectively, the "Member Data").
    a.  A reasonable time after admission, the Corporation and the Member will agree upon a 'Certification Date' that obligates the Member to the following two sections herein. The Member shall be notified in writing by the Corporation of the Certification Date.
    b.  Within sixty (60) days of the Certification Date, and at least every sixty (60) days thereafter, the Member shall transmit: (1) all inactive and active voter files (excluding those records that are confidential or protected from disclosure by law), including those fields identified in Exhibit B, and (2) all licensing or identification records contained in the motor vehicles database (excluding those fields unrelated to voter eligibility, such as fields related to an individual's driving record), including those fields identified in Exhibit B. Under no circumstances shall the Member transmit an individual's record where the record contains documentation or other information indicating that the individual is a non-citizen of the United States.
    c.  If the Member fails to transmit the required Member Data as described above, ERIC shall not deliver, nor shall the Member receive, any Data or services from ERIC until ERIC receives the required Member Data from the Member. Should ninety (90) days pass without receipt of a transmission of Member Data from the Member, the Member shall be removed from membership in accordance with the Bylaws.

*See also* Exhibit 2, ERIC Membership Agreement, ¶ 2 (similar language).

48.     The purpose of the ERIC contract is different than the purpose of the DPS contract.

10

49.     The purpose of the ERIC contract is, in part, to use the state's private driver data to identify eligible but unregistered persons (EBU's), create EBU's lists and to send EBU mailers.

50.     The diagrams below show how ERIC identifies EBU's and how ERIC creates EBU lists:



## HOW EBU LISTS ARE CREATED

EBUs are the "individuals in the motor vehicle file who do not have a matching voter record."

51.     At the DPS, people are provided the opportunity to register to vote.

52.     People at the DPS either register to vote or decline to register to vote.

53.     The DPS database, therefore contains both people who have registered to vote and those who have declined to vote.

54.     When ERIC receives the DPS database and the SVRS database, ERIC compares them to determine who has declined to register to vote.

55.     The defendants and ERIC understand that the people who have declined to register to vote at DPS are individuals who are in the DPS database, but who do not have a matching voter record in the SVRS database.

56.     The defendants and ERIC label these people who have declined to register EBU's.

57.     ERIC creates a list of these people have declined to register to vote and calls it an EBU list which it sends to defendants.

58.     The defendants under the ERIC contract are obligated to contact the people listed on the EBU list.

59.     No other private entity or person, other than ERIC and whomever ERIC and the defendants give the information to, has access to this information about people who decline to register at DPS.

60.     A dictionary definition of "voter registration drive" is "the distribution and collection of voter registration applications by two or more persons for delivery to a county clerk and recorder." (https://www.lawinsider.com/dictionary/voter-registration-drive).

61. Under this definition of "voter registration drive," the ERIC contract constitutes a voter registration drive: identifying EBU's, creating EBU lists and sending EBU mailers.

62. Typically, private parties—including plaintiffs, campaigns, political parties and organizations—conduct voter registration drives as acknowledged and regulated by federal campaign finance laws.

63. Federal campaign finance laws apply to private parties' voter registration activities. 11 C.F.R. § 100.133.

64. According to Ballotpedia, private parties conduct voter registration drives:

> A voter registration drive (VRD) is a coordinated effort to register new voters. Participants in a voter registration drive distribute voter registration forms, provide assistance in completing them, and return the forms to elections offices. State laws govern how voter registration drives are conducted. As of 2020, eleven states required participants in voter registration drives to undergo training. Twenty-two states set special deadlines for the return of voter registration forms collected in drives. Finally, seven states required groups to pre-register with the state or to report on its registration activities.

65. But, the ERIC contract authorizes something very different: a government-sponsored voter registration drive run by the defendants and a private entity ERIC.

66. ERIC founder and then ERIC board member David Becker claims that "ERIC is the single most effective voter registration drive in the history of the United States." Int'l Ass'n Privacy Pros, Data integrity as a method for preserving democracy, YouTube (Oct. 26, 2018), https://www.youtube.com/watch?v=Y5dJEYEB5qY&t=1310s.

67. The ERIC contract entered under § 21083(5)(B)(i), unlike the DPS contract, does not have following attributes to satisfy the legal requirements of § 21083(5)(B)(i): an

agreement between the two state agencies; and, limiting private driver data disclosures to the extent required to enable public officials to match voter registration application information.

68.     The ERIC contract is between the defendants and ERIC, not between the DPS and ERIC.

69.     ERIC employees, not public officials, obtain and use the driver data.

70.     ERIC obtains the EBU's private driver data which is more than is required to match voter registration application information because the EBUs don't have voter registration applications. ERIC obtains more private driver data than is required for SVRS list maintenance activities.

71.     Notably, the defendants claim that ERIC updates addresses of people already in the SVRS database, but that is inaccurate because the data is regularly updated per the process under paragraph 2.1 of the DPS contract.

72.     Defendants and ERIC are running a government-sponsored voter registration drive by doing the EBU identification, EBU lists and EBU mailers.

73.     The ERIC contract conflicts with § 21083(5)(B)(i) because § 21083(5)(B)(i) limits the private driver data disclosure to public officials matching voter registration application information, not to run a government-sponsored voter registration drive with EBU driver data, EBU identification, EBU lists and EBU mailers.

74.     Since EBU's who have declined to register at DPS do not have voter registration application information to match, ERIC receives EBU's private driver data, under § 21083(5)(B)(i), not to enable public officials to match voter registration application information, but to conduct a government-sponsored voter registration drive.

75.     In summary, there are two contracts, involving the defendants, which disclose two different sets of private driver data, both sets include plaintiffs' private driver data, to two different entities for two very different purposes.

76.     First, the DPS discloses to the defendants, certain private driver data, including plaintiffs' private driver data, but not EBU's private driver data, disclosed only to match voter registration application information which EBU's do not have because they declined to register.

77.     Second, the DPS discloses to defendants to disclose to ERIC certain private driver data disclosures, including plaintiffs' and EBU's private driver data, for government-sponsored voter registration drives, to identify EBUs, create EBU lists and send EBU mailers.

78.     In the case of the second purpose, Plaintiffs argue a DPPA violation.

79.     In response, the defendants and ERIC argue that the private driver data the defendants receive from DPS and, in turn, disclose to ERIC is authorized under the "public function" exception and the "research" exception to the DPPA's rule of non-disclosure for private driver data.

80.     In reply, the plaintiffs claim that those DPPA exceptions do not apply because the ERIC contract's government-sponsored voter registration drive is preempted under 52 U.S. Code § 21084 due to such state-sponsored voter registration drives being inconsistent with federal law, including 52 U.S. Code § 21083(5)(B)(i), and because ERIC is not doing "research" on the private driver data.

81.     Moreover, ERIC is not too big to fail because Minnesota would be better off without it.

82.     ERIC's government-sponsored voter registration drive is unregulated by federal or state law, lacks transparency, and undermines confidence in Minnesota's elections.

83.     Minnesota's voter list could be more accurate if maintenance were done internally as described in Minnesota statutes and in the DPS contract.

84.     Using publicly available information and the USPS National Change of Address list to identify people who have moved would produce the same "moved lists" currently provided by ERIC and at a lower cost to Minnesota.

85.     The Social Security Death Index can be used to identify voters who died out of state. State law also requires the Department of State to obtain death information from the commissioner of health.

86.     The defendants already have personnel who daily process the lists received from DPS.  The same personnel could easily process the data from alternate sources with no increase in time and at a lower cost. This change would protect the private driver data of Minnesota's citizens and maximize the accuracy of Minnesota's voter registration database.

87.     EAC data shows that non-ERIC states spend less money on voter list maintenance and have more accurate voter rolls. States that implement internal procedures do list maintenance better, cheaper, and safer than ERIC states.

88.     Furthermore, the defendants do not offer private driver data to other private parties conducting their voter registration drives, such as AGA, but the same driver data is used by defendants and ERIC for their voter registration drive.

89.     The defendants cite the DPPA as the reason that the private driver data is not offered to these private parties, such as AGA, for voter registration activities.

90.     The defendants have never explained why only private entity ERIC, and no other private entity, such as AGA, may obtain and use private driver data to run voter registration drives.

91.     The unique story of the origin of ERIC goes back about 20 years. In 2005, the limited liability company Catalist existed. Catalist was committed to providing "Innovative, consolidated voter data services in the progressive political marketplace, services that will allow progressives to realize the advantages of data-driven campaigns that increase the precision and power of fundraising and outreach efforts" https://www.dcjobs.com/company/profile/Catalist-LLC/3FB52C833D6F794FB29913ADFB98C57D (last visited Oct. 7, 2023); See also https://catalist.us/who-we-are/ (last visited Oct. 7, 2023).

92.     In 2009, "Catalist included a 2008 post-election report evaluating the efforts of over 90 progressive organizations, unions, campaigns that utilized Catalist data during the 2008 presidential cycle. Their analysis found that in the 2008 election in OH, FL, IN, and NC, "the number of votes cast by new voters who were registered by progressives exceeded the [Obama's] margin of victory in that state…By implication, this suggests that the additional voters generated through progressive voter registration activities may have been essential to an Obama victory in that state." (Catalist: Aggregate Activities of Progressive Organizations in 2008).

93.     In 2010, ERIC, while not yet named as such, was first publicly proposed in the Pew Center for the State's report, Exhibit 13 (Upgrading Democracy: Improving America's Elections by Modernizing States' Voter Registration Systems, Pew Trusts (Nov. 2010), https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/upgradingdemocracyreportpdf.pdf.) The report suggested that states needed to combine private-sector available data with government data, and suggests that combining this data would enable creating a list of "eligible, but unregistered voters." E.g., id. at 19, 23, 24.

94.     In 2012, ERIC was announced as a consortium of states operating the "membership organization," though none of the seven initial member states themselves had conceived the concept of ERIC, nor did the states draft the ERIC membership agreement. David Becker was the founder of ERIC.

95.     There is no record of ERIC or any state election officials ever approaching Congress to amend the DPPA to authorize sharing private driver data with ERIC to run government-sponsored voter registration drives.

96.     In 2018, founder of ERIC and then non-voting board member David Becker announced that "ERIC is the single most effective voter registration drive in the history of the United States." Int'l Ass'n Privacy Pros, Data integrity as a method for preserving democracy, YouTube (Oct. 26, 2018), https://www.youtube.com/watch?v=Y5dJEYEB5qY&t=1310s.

97.     By the time of the 2020 election, ERIC's membership included over 30 states.

98.     Nine states have withdrawn from ERIC since the 2020 election.  Starting in January 2022, Louisiana, Alabama, Florida, Missouri, West Virginia, Iowa, Ohio, Virginia and Texas have withdrawn from ERIC membership.

99.     One reason Alabama Secretary of State cited for withdrawing from ERIC membership is because the ERIC contract obligates states to disclose private driver data to ERIC. Exhibit 4 (Press Release of Wes Allen, Alabama Secretary of State).

100.     The Missouri Secretary of State expressed concern that ERIC refuses to, has not, or will not remove the obligation from states to contact the individuals identified on the EBU list. See, e.g., Exhibit 5 (Letter of ERIC Withdrawal from Missouri Secretary of State John Ashcroft.).

101.     And, in his press release announcing that Florida would withdraw, the Florida Secretary of State cited concern for protecting citizen privacy, saying "As Secretary of State, I have an obligation to protect the personal information of Florida's citizens, which the ERIC agreement requires us to share." Exhibit 6  (PRESS RELEASE: Florida Withdraws From Electronic Registration Information Center (ERIC) Amid Concerns About Data Privacy and Blatant Partisanship, FL Dept. of State (Mar. 6, 2023), https://dos.myflorida.com/communications/press-releases/2023/press-release-florida-withdraws-from-electronic-registration-information-center-eric-amid-concerns-about-data-privacy-and-blatant-partisanship/).

102.     Nonetheless, the defendants, in the ERIC contract, represent and warrant that the transmissions of private driver data to ERIC, and to other "agents, contractors or subcontractors comply fully with applicable federal…laws, rules and regulations":

> The Member [here, Minnesota, through Defendant Secretary of State] represents and warrants that all uses and transmissions of Data originating from the Member to ERIC and/or ERIC's agents, contractors or subcontractors comply fully with applicable state, federal and local laws, rules and regulations.

Exhibit 1, ERIC Membership Agreement ¶ 4(a); *see also* Exhibit 2, ERIC Membership Agreement ¶ 3(b)(i) (similar representations and warranties).

103.    Notably, the ERIC contract contains an indemnification provision where governmental defendants, referred to as "Members," agreed to indemnify ERIC for any DPPA claims.  Provision 4(d) of the ERIC contract states:

> d. Unauthorized Disclosure of Data-ERIC: Should there be an unauthorized disclosure of motor vehicle data by ERIC, whether accidental or intentional or the responsibility of a third party ("ERIC Unauthorized Disclosure"), ERIC shall immediately give notice to Members. Understanding that ERIC's primary source of funds are fees and dues paid by Members, and subject to consultation and approval by the Board, ERIC agrees to indemnify, defend and hold harmless state motor vehicle agencies against any claims related to an ERIC Unauthorized Disclosure of Data.

Exhibit 1, ERIC Membership Agreement, ¶ 4(d); *see also* Exhibit 2, ERIC Membership Agreement ¶ 3(g)(i)(3) (similar indemnification language).

104.    Based on the defendants' representations, warranties and indemnification, once the plaintiffs' driver data is obtained, ERIC has the authority, whether monthly, periodically, or at any time, to disclose the plaintiffs' private driver data to other private entities such as ERIC's "agents, contractors or subcontractors." Exhibit 1, ERIC Membership Agreement ¶ 4(a); *see also* Exhibit 2, ERIC Membership Agreement ¶ 3(b)(i) (similar language referring to "agents, contractors or subcontractors).  ERIC has never publicized the identities of its "agents, contractors or subcontractors."

105.    Yet, according to at least one of ERIC's reports, the report of eligible but unregistered individuals (EBU list) from some member states has been disclosed by ERIC to at least to one other private nongovernmental third party organization, the Center for Election Innovation Research (CEIR). Exhibit 7 (Email to various Secretaries of State or their designated statewide voter registration database agents, from founder of ERIC and CEIR, David Becker from Becker's CEIR email addresses).  By entering the ERIC contract, the Secretary enables ERIC to disclose private driver data to CEIR and other third parties it chooses.

106.    And, the public, including the plaintiffs, never know about the transfers from ERIC to CEIR.

107.    To be sure, ERIC performs some data matching using voters' data and private driver data and generates and sends various reports to each member state. ERIC reports include but are not limited to the following periodic reports: (A) Eligible but Unregistered Report (EBU list); (B) Cross-State Movers Report; (C) In-State Movers Report; (D) Duplicate [Registrations] Report; (E) Deceased Report; (F) Voter Participation Report; and, (G) National Change of Address (NCOA) Report.  Exhibit 2, ERIC Membership Agreement ¶ 3 (d).

108.    But, these reports are generated on the condition that ERIC may share the private driver data with others like CEIR and on the condition that the state sends the mailer to each person on ERIC's EBU list report.

109.    Each adult plaintiff has successfully applied for a driver's license, driver's license permit, or state identification number in the State of Minnesota.

110.    Each plaintiff has held, applied or will apply for a driver's license, driver

learners' permit, or state identification number in the State of Minnesota.

111.    In so doing, the adult plaintiffs have shared the following information with the

DPS:

- Name
- Address
- Driver's license number or state ID number
- Last four digits of Social Security number
- Date of birth
- Affirmative documentation of citizenship
- The title/type of affirmative documentation of citizenship presented
- Phone number
- E-mail address or other electronic contact method

The plaintiffs' data, identified above, are referenced throughout this complaint as "private

driver data."

112.    The plaintiffs have never consented that the defendants disclose their private

driver data to ERIC or any other private person or entity.

113.    The plaintiffs have copies of contracts between the Secretary of State and

ERIC. The contracts consist of Bylaws and a Membership Agreement between the Secretary

of State and ERIC. The contracts are attached as Exhibit 1 (ERIC Bylaws and Membership

Agreement signed version) and Exhibit 2 (ERIC Bylaws and Membership Agreement 2023

unsigned version).

114.    The defendants understand that private driver data is disclosed to ERIC. See

Exhibits. 1, 2 (ERIC membership agreements).  Minnesota Statutes § 201.13(d) authorizes

such disclosures to ERIC:

(1) name;

(2) date of birth;
(3) address;
(4) driver's license or state identification card number;
(5) the last four digits of an individual's Social Security number; and
(6) the date that an individual's record was last updated.

115.    The defendants have disclosed, continue to disclose, and will continue to disclose private driver data, including private driver data of minors and those who affirmatively decline to register to vote, through disclosures to ERIC.

116.    The defendants have, or have had a contract (Exhibits 1 & 2) with the private non-stock corporation ERIC, which authorizes the monthly or periodic disclosure of the plaintiffs' following private driver data to ERIC:

- All name fields
- All address fields
- Driver's license or state ID number
- Last four digits of Social Security number
- Date of birth
- Activity dates as defined by ERIC's Board of Directors
- Current record status
- Affirmative documentation of citizenship
- The title/type of affirmative documentation of citizenship presented
- Phone number
- E-mail address or other electronic contact method.

Exhibit 1, ERIC Membership Agreement, Exhibit B; Exhibit 2, ERIC Membership Agreement, Exhibit B (similar list, but excluding two items regarding affirmative documentation of citizenship).

117.    Under either the original or updated contract, or both, at least every 60 days, defendants have disclosed or continue to disclose the plaintiffs' following private driver data to private entity ERIC under the categories listed below:

- All name fields
- All address fields
- Driver's license or state ID number
- Last four digits of Social Security number
- Date of birth
- Activity dates as defined by the [ERIC's] Board of Directors
- Current record status
- Phone number
- E-mail address or other electronic contact method.

*Id.*

118.    Under the ERIC agreement, ERIC obtains, uses and discloses private driver data from the state's motor vehicle authority (here, Minnesota Department of Public Safety), to create a list of individuals who are potentially eligible but unregistered (EBU) to vote. Exhibit 1, ERIC Membership Agreement ¶ 5(a);  Exhibit 2, ERIC Membership Agreement ¶ 4(a);

119.    Under the contract, states, including Minnesota, are obligated to contact those individuals on the EBU list. Id.

120.    Under the ERIC agreement, the state of Minnesota is obligated to contact those individuals on the EBU list to inform them about registering to vote. Id.

121.    The EBU lists contain individuals who have affirmatively declined to register to vote. The EBU lists contain individuals who may not be eligible to register to vote.

122.    Under the agreement, the defendants transfer to ERIC the private driver data for those who affirmatively decline to register to vote. *Id.*

123.    As to the minor plaintiffs, they and their parents are concerned that private driver data of minor children may be disclosed to ERIC.

124.    Unlike nine states since 2022, Minnesota has not withdrawn from ERIC to protect residents' driver data privacy under the DPPA.

## Count I

## DPPA Violations

125.    The above paragraphs are incorporated herein by reference.

126.    The DPPA regulates interstate commerce, protects private driver data and does not violate principles of federalism.

127.    The private cause of action under the DPPA, 18 U.S.C. § 2724(a), is accurately quoted as:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

128.    The DPPA expressly prohibits disclosure of private driver data "personal information," including "social security number" and "driver identification number," unless one of the enumerated exceptions apply.  18 U.S.C. §§ 2721, 2725(3).

129.    None of the enumerated exceptions in the DPPA, 18 U.S.C. § 2721(b)(1–14), exempt the purpose of "voter registration drives" from the DPPA's non-disclosure rule for private driver data.

130.    The Secretary of State's argument for the DPPA "government function" exception is unpersuasive because such a state government function is  preempted under federal election law.

131.    The Secretary of State's principal argument is based on the DPPA's "government function" exception, which authorized, in relevant part, disclosure of private driver data:

> (1)  For use by … any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

132.    The Secretary of State claims that this government function exception authorizes the state agency's disclosure of private driver data to ERIC.  The plaintiffs contend that the state's purported government function is preempted under 52 U.S. Code § 21084 because it is inconsistent with federal election law.

133.    Congress has preempted state "election technology and administration" requirements" "inconsistent" with federal election laws.

134.    Congress, pursuant to the Elections Clause, enacted a federal law preempting state "election technology and administration requirements" "inconsistent" with federal election laws.

135.    52 U.S. Code § 21084, accurately quoted here, preempts states from having election "technology and administration requirements" which are "inconsistent" with federal law:

> The requirements established by this subchapter are minimum requirements and nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under this subchapter so long as such State requirements are not inconsistent with the Federal requirements under this subchapter or any law described in section 21145 of this title.

Pub. L. 107–252, title III, § 304, Oct. 29, 2002, 116 Stat. 1714. The statutory reference to the subchapter is to HAVA, including 52 U.S. Code § 21083(5)(B)(i).  The statutory reference to

§ 21145 includes descriptions of other federal laws: (1) National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.]; (2) The Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.]; (3) The Voting Accessibility for the Elderly and Handicapped Act (42 U.S.C. 1973ee et seq.) [now 52 U.S.C. 20101 et seq.]; (4) The Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff et seq.) [now 52 U.S.C. 20301 et seq.]; (5) The National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.]; (6) The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.); and (7) The Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.).

136.    Therefore, any state election "technology" and "administration" requirement which is "inconsistent" with these federal laws is preempted.

137.    Minnesota Statutes § 201.13 (d) and the ERIC contract are preempted under 52 U.S. Code § 21084 because they are "election technology and administration requirements" "inconsistent" with federal election laws.

138.    Federal election law is premised on voter registration activities and EBU identification, listing and mailers being a private function within states, not a state's government function.

139.    The state's purported government function exception (DPPA's (b)(1) exception) argument is unpersuasive because Minnesota Statutes § 201.13 (d) and the ERIC contract are preempted because voter registration activities are a federally-recognized private, not a government, function.

140.    The U.S. Election Assistance Commission has issued an advisory opinion that state election officials are prohibited from using federal funds to conduct "voter registration drives":

> 3. Neither Section 101 nor 251 funds may be used to conduct voter registration drives or get out the vote efforts; including advertising for the event, setting up booths, and paying salaries of employees who register new voters.

U.S. Election Assistance Commission Funding Advisory Opinion FAO-08-005. Exhibit 8.

141.    Since FY 2006, Office of Inspector General (OIG) audits of HAVA grants have resulted in 19 recommendations and just over $1 million dollars in questioned costs related to government-sponsored voter registration drives and GOTV activities.

142.    Mississippi expended HAVA funds for GOTV and voter registration forms, which are not allowable under the award's terms and conditions or HAVA.  Exhibit 9.

143.    Florida charged salaries and benefits for poll workers serving at voter registration drives to HAVA grants, resulting in $139,056 in questioned costs.  Exhibit 10.

144.    South Dakota spent $1,474 in HAVA funds for letters containing a sample voter registration form to be distributed to K-12 students for voter education. Students in grades K-12 are not eligible voters, making the expense unallowable. Exhibit 11.

145.    Colorado charged $315,830 to its HAVA grant for contractual services associated with a voter registration campaign, which included only an incidental educational component. As a result, the charges were questioned.  Exhibit 12.

146.    Further, federal campaign finance laws are premised on voter registration drives being conducted by private parties, not the government.  *See* 11 C.F.R. § 100.133.

147.    There is no provision in federal election laws legally authorizing state election officials to use private driver data for government-sponsored voter registration drives.

148.    Yet, the ERIC contract requires the defendants to disclose private driver data to ERIC, for ERIC to identify eligible, but unregistered persons (EBU) and put them on a list (EBU list), and for the Secretary of State to send each person on the EBU list a mailer to register to vote.

149.    But, such voter registration drives involving EBU identification, EBU lists and EBU mailers are a federally-recognized private function, not a government function.

150.    Meanwhile, at the time of the creation of ERIC in 2012, came the argument that Secretary of State- and ERIC-sponsored voter registration activities, EBU identification, EBU lists and EBU mailers are a "government function" under the DPPA.

151.    At that time, the DPPA and other federal laws did not change.

152.    The history of ERIC shows that it was the non-profit Pew Research and subsequently ERIC recruiting Secretaries of State, who instead of amending the DPPA, agreed to make the legal argument under the DPPA that Secretary of State- and ERIC-sponsored voter registration activities, EBU identification, EBU list and EBU mailers fell under the "government function" exception.

153.    But, without a Congressional enactment amending the DPPA or federal election law, the government-sponsored voter registration activities, EBU identification, EBU lists and EBU mailers are not a government function under the DPPA.

154.    Preemption applies under 52 U.S.C. § 21083 because it is impossible to comply with 52 U.S.C. 21083(5)(B)(i) and the state law and the ERIC contract.

155. It is impossible to comply with both the federal law and the state law because the state law and ERIC contract are inconsistent with 52 U.S.C. 21083(5)(B)(i).

156. Minnesota Statutes § 201.13 (d) authorizes the sharing with ERIC of personal information released to the secretary of state by the commissioner of the DPS:

> If, in order to maintain voter registration records, the secretary of state enters an agreement to share information or data with an organization governed exclusively by a group of states, the secretary must first determine that the data security protocols are sufficient to safeguard the information or data shared. If required by such an agreement, the secretary of state may share the following data from the statewide voter registration system and data released to the secretary of state under section 171.12, subdivision 7a:
> (1) name;
> (2) date of birth;
> (3) address;
> (4) driver's license or state identification card number;
> (5) the last four digits of an individual's Social Security number; and
> (6) the date that an individual's record was last updated.

157. And, Minnesota Statutes § 171.12, subd. 7a, states, "The commissioner [of public safety] shall disclose personal information to the secretary of state for the purpose of increasing voter registration and improving the accuracy of voter registration records in the statewide voter registration system."

158. So, accordingly, under Minnesota Statutes § 201.13(d) and the ERIC Contract, the defendants, at least every 60 days, share plaintiffs' private driver data, including driver's license number and social security number (last 4 digits), with ERIC.

159. To the contrary, the DPPA expressly prohibits disclosure of private driver data "personal information," including "social security number" and "driver identification number," unless one of the enumerated exceptions apply:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the

individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. §§ 2721, 2725(3).

160.    None of the enumerated exceptions in the DPPA, 18 U.S.C. § 2721(b)(1–14), exempt the purpose of "voter registration" from the DPPA's non-disclosure rule for private driver data.

161.    Plus, a later, specific, limited governmental function for government officials was stated for "verification of voter registration information" in the 2002 Help America Vote Act (HAVA), 52 U.S. Code § 21083(5)(B)(i).

162.    Minnesota Statutes § 201.13(d) and the ERIC Contract conflict with 52 U.S. Code § 21083(5)(B)(i).

163.    Preemption applies under 52 U.S.C. § 21084 because it is impossible to comply with 52 U.S. Code § 21083(5)(B)(i) and Minnesota Statutes § 201.13(d) and the ERIC Contract.

164.    The later, specific, limited governmental function, 52 U.S. Code § 21083(5)(B)(i), authorizes sharing personal information in the driver database subject to an agreement between the chief State election officials and the official responsible for the State motor vehicle authority of a state and "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration":

> (5) Verification of voter registration information…
>     (B) Requirements for State officials
>         (i) Sharing information in databases
>             The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with

information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

165.    In this limited way, HAVA authorizes some sharing of personal information in the driver database for voter registration purposes, but subject to limitations: (1) an agreement between the chief State election officials and the official responsible for the State motor vehicle authority of a state and (2) "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." Id.

166.    But, in violation of these federal limitations, Minnesota Statutes § 201.13(d) and the ERIC contract, together, authorize the Secretary of State to enter into an agreement with ERIC to share the Plaintiffs' personal information (1) without being subject to an agreement between the chief State election officials and the official responsible for the State motor vehicle authority of a state and (2) without regard to HAVA's limiting phrase for data sharing of the Plaintiffs' personal information "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." Minn. Stat. § 201.13(d).

167.    Thus, Minnesota Statutes § 201.13(d) and the ERIC contract violate federal law because Minnesota Statutes § 201.13(d) and the ERIC contract authorize the defendants to enter into an agreement with ERIC to share the plaintiffs' personal information, without the DPS being a party to the contract, and without regard to HAVA's limiting phrase for data sharing "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083.

168.   And, under Minnesota Statutes § 201.13(d) and the ERIC contract, the defendants' periodic disclosure of plaintiffs' federally-protected private driver data to ERIC and its "agents, contractors or subcontractors" and others are without a DPPA-permitted purpose because it does not satisfy the DPPA's enumerated exceptions and does not satisfy HAVA's later, specific, limited governmental function. 18 U.S.C. § 2724; 52 U.S.C. § 21083; Exhibits 1 and 2.

169.   It is impossible to comply with 52 U.S. Code § 21083(5)(B)(i) and the ERIC contract under Minnesota Statutes § 201.13(d).

170.   Essentially, the Defendants' disclosures of Plaintiffs' personal information to ERIC under the contract do not satisfy HAVA's later, specific limited exception to the DPPA for multiple reasons.  52 U.S. Code § 21083(5)(B)(i).

171.   First, the ERIC contract is not a contract with the DPS, as 52 U.S.C. § 21083 requires, because it is only a contract between ERIC and the Secretary of State.

172.   Second, the ERIC contract ostensibly authorizes ERIC, a private non-profit corporation to obtain data from DPS, not "each such official" as HAVA requires.

173.   Third, the ERIC contract obligates the state to provide information on eligible, but unregistered (EBU) voters, including persons who decline to register, which violates the limitation that the information is provided to verify the accuracy of the information provided on applications for voter registration.

174.   Alternatively, if there is a government function, then the ERIC contract still violates the DPPA because more private driver data is disclosed to ERIC to perform database maintenance.

175.    First, private driver data regarding minors and other ineligible persons such as non-citizens are unnecessary to disclose because they cannot register to vote.

176.    Second, driver data of ineligible persons, such as non-citizens, is shared unnecessarily.

177.    Third, private driver data regarding eligible but unregistered persons is unnecessary to disclose because they have declined to register to vote.

178.    Fourth, the state provides disclosure at least every 60 days when ERIC's reports are less frequent. The number of state disclosures should correspond to the number of ERIC reports issued.

179.    The driver data disclosures to ERIC under Minnesota law and the ERIC Contract, do not satisfy the DPPA's research exception (DPPA's (b)(5) exception).

180.    Conditions for the DPPA's (b)(5) research exception are not met.

181.    Under 18 U.S.C. § 2721(b)(5), sharing of driver data is allowed:"[f]or use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals."

182.    Here, even if ERIC and/or CEIR are receiving this data from the State in-part for research purposes, they are also using it to create EBU lists.

183.    These EBU lists are redisclosed to the state for the express purpose, as contractually obligated through the Secretary's ERIC agreement, of contacting individuals.

184.    The State has used the EBU lists to contact the individuals on the list to fulfill the contractual obligation.

185.    By sharing driver data with ERIC, and possibly CEIR, in order to identify and contact individuals disclosed to have declined to register to vote, the defendants have promulgated an affront to privacy the DPPA was designed to prevent.

186.    Based on these facts, the DPPA's (b)(5) research exception has not been met.

187.    None of the remaining DPPA exceptions are satisfied either.

188.    The DPPA § 2721(b)(2–4 and 6–14) exceptions do not apply either. Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data for anything in connection with motor vehicles.

189.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(2) exception because the "use" is not "in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers." 18 U.S.C. § 2721(b)(2).

190.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data for business use to verify the accuracy of personal information submitted to itself as a business.

191.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(3) exception because the "use" is not "in the normal course of business by a legitimate business or its

agents, employees, or contractors" for the use "to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors" or to obtain " correct information…for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual." 18 U.S.C. § 2721(b)(3).

192.    Nothing in the ERIC contract (Exhibits 1 & 2) or in the publically-available marketing suggests that ERIC is, or contemplates, using private driver data for use in governmental proceedings (such as administrative hearings) or in anticipation of litigation.

193.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(4) exception because the "use" is not a "use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." 18 U.S.C. § 2721(b)(4).

194.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data for insurance or insurance support purposes.

195.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(6) exception because the "use" is not a "use by any insurer or insurance support organization, or by a

self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting." 18 U.S.C. § 2721(b)(6).

196.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data in connection with towed or impounded vehicles.

197.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(7) exception because the "use" is not a "use in providing notice to the owners of towed or impounded vehicles." 18 U.S.C. § 2721(b)(7).

198.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data for licensed private investigation or licensed security services.

199.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(8) exception because the "use" is not a "use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection." 18 U.S.C. § 2721(b)(8).

200.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data to obtain or verify information relating to commercial drivers' licenses.

201.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(9) exception because the "use" is not a "use by an employer or its agent or insurer to obtain or verify

information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49." 18 U.S.C. § 2721(b)(9).

202.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available marketing suggests that ERIC is, or contemplates, using private driver data in connection with operating or collecting tolls.

203.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(10) exception because the "use" is not a "use in connection with the operation of private toll transportation facilities." 18 U.S.C. § 2721(b)(10).

204.    The Plaintiffs did not give express or implied consent for the state to disclose their private driver data to ERIC.

205.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(11) exception because the "use" is not a "use in response to requests for individual motor vehicle records [where] the State has obtained the express consent of the person to whom such personal information pertains." 18 U.S.C. § 2721(b)(11).

206.    The Plaintiffs did not give express consent for the state to disclose their private driver data for use in bulk distribution for surveys, marketing, or solicitations.

207.    Therefore, the use of the private driver data by ERIC and its "agents, contractors or subcontractors" and others does not satisfy the DPPA (b)(12) exception because the "use" is not a use "For bulk distribution for surveys, marketing or solicitations if

38

the State has obtained the express consent of the person to whom such personal

information pertains." 18 U.S.C. § 2721(b)(12).

208.    The Plaintiffs did not give ERIC written consent for the state to disclose their

private driver data to ERIC.  ERIC has not sought written consent for the state to disclose

their private driver data to ERIC.

209.    Therefore, the use of the private driver data by ERIC and its "agents,

contractors or subcontractors" and others does not satisfy the DPPA (b)(13) exception

because the "use" is not a use "use by [a] requester, [where] the requester demonstrates it has

obtained the written consent of the individual to whom the information pertains." 18 U.S.C.

§ 2721(b)(13).

210.    Further, ERIC has not obtained written consent from other non-plaintiff

individual state drivers.

211.    Therefore, the governmental defendants and ERIC have failed, as a part of the

ERIC contract, to establish a system where persons can consent, that is "opt-out" of DPPA

privacy protection, in order for their private driver data being used for the purposes

identified in the contract to satisfy the exception requirement of DPPA (b)(13). 18 U.S.C. §

2721(b)(13).

212.    Nothing in the ERIC contract (Exhibits 1 & 2) or its publically-available

marketing suggests that ERIC is, or contemplates using private driver data for a use related

to operation of a motor vehicle, or for public safety.

213.    Therefore, the use of the private driver data by ERIC and its "agents,

contractors or subcontractors" and others does not satisfy the DPPA (b)(14) exception

because the "use" is not a "use specifically authorized under the law of the State that holds

the record, if such use is related to the operation of a motor vehicle or public safety." 18

U.S.C. § 2721(b)(14).

214.    The plaintiffs and their DPPA privacy rights are injured and damaged by the

defendants' continuing DPPA violations.

## Jury Trial Demand

The Plaintiffs demand a jury trial.

## Prayer for Relief

The Plaintiffs pray to the Court for the following relief against the Defendants:

(1) prospective declaratory relief, including declaring the governmental

Defendants' disclosures of DPPA-protected private driver data to ERIC

under Minnesota Statutes § 201.13(d) and under the ERIC contract are

DPPA violations;

(2) prospective injunctive relief, including enjoining the Defendants'

disclosures of DPPA-protected private driver data to ERIC under

Minnesota Statutes § 201.13(d) and the ERIC contract;

(3) award reasonable attorneys' fees and other litigation costs reasonably

incurred; and

(4) any other equitable or legal relief the court deems just to award.

Dated: October 12, 2023

/s/ Erick G. Kaardal
Erick G. Kaardal, No. 229647
Elizabeth A. Nielsen, No. 0403696
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Email: kaardal@mklaw.com
Email: nielsen@mklaw.com
*Attorneys for Plaintiffs*